1  Aidan W. Butler (SBN 208399)
   Attorney at Law
2  3550 Wilshire Boulevard, Suite 1924
   Los Angeles, California 90010
3  Telephone: (213) 388-5168
   Telecopier: (213) 388-5178
4  tocontactaidan@gmail.com

5  Attorneys for Plaintiff HOVHANNES MARKOSYAN

6

7

8              **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10

11 | HOVHANNES MARKOSYAN, an        | )  **CASE NO.: 2:17-cv-05400-DMG-JC**
   | individual,                    | )
12 |                                | )
   |                                | )  **MEMORANDUM OF POINTS AND**
13 |            Plaintiff,          | )  **AUTHORITIES IN OPPOSITION TO**
   |                                | )  **MOTION FOR SUMMARY**
14 |                                | )  **JUDGMENT**
   |     vs.                        | )
15 |                                | )
   |                                | )  **[STATEMENT OF GENUINE**
16 |                                | )  **DISPUTES, SUPPORTING**
   | HUNTER WARFIELD, INC., a Florida| ) **DECLARATIONS, AND**
17 | corporation; and DOES 1-10, inclusive, | ) **EVIDENTIARY OBJECTIONS**
   |                                | )  **SUBMITTED CONCURRENTLY]**
18 |                                | )
   |            Defendants.         | )  **Date: May 11, 2018**
19 |                                | )  **Time: 3:00 pm**
   |                                | )  **Courtroom: 8C**
20

21

22         COMES NOW plaintiff HOVHANNES MARKOSYAN and submits his

23 Memorandum of Points and Authorities in Opposition to the Motion for Summary

24 Judgment (Docket Entry 25) filed by defendant HUNTER WARFIELD, INC.

25 (occasionally "Defendant" or "HW"), as follows:

26 / / /

27 / / /

28 / / /

# **TABLE OF CONTENTS**

I. BACKGROUND FACTS ...................................................................................1

II. THE APPLICABLE STANDARD ....................................................................6

III. ARGUMENT ..................................................................................................7

    A. HW VIOLATED THE FDCPA AND THE ROSENTHAL ACT ...........7

    B. HW VIOLATED THE FCRA AND THE CCRAA ...............................11

    C. PLAINTIFF'S CLAIMS UNDER THE CCRAA AND
    THE ROSENTHAL ACT ARE NOT PREEMPTED ..................................20

    D. THE BONA FIDE ERROR DEFENSE DOES
    NOT SHIELD DEFENDANT FROM LIABILITY ....................................21

    E. HW DID NOT MAINTAIN REASONABLE PROCEDURES
    FOR  COMPLYING WITH THE FCRA OR CCRAA ...........................23

IV. PLAINTIFF HAS SUFFERED COMPENSABLE
    DAMAGES ...........................................................................................24

V. A REASONABLE JURY COULD FIND THAT THE
    DEFENDANT ACTED WILLFULLY .....................................................25

VI. CONCLUSION.............................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**STATUTES**

15 U.S.C. §1681i ................................................................................13

15 U.S.C. §1681n(a)(1)(A) ...............................................................24

15 U.S.C. §1681s-2(a(1)(A)) ............................................................16

15 U.S.C. §1681s-2(b) ................................................................12, 16

15 U.S.C. §1692g(b) ...........................................................................8

15 U.S.C. §1692e(8) .......................................................................8, 9

15 U.S.C. §1692e(10) .........................................................................9

15 U.S.C. §1692f ................................................................................8

15 U.S.C. §1692k(b)(1) ......................................................................7


Fed. R. Civ. Pro. 56 ...........................................................................6


Civil Code section 1785.25(a) .........................................................16

Civil Code section 1785.25(g) .........................................................23

Civil Code section 1788.17 ................................................................9

Civil Code Section 1950.5(b)(2),(e) ................................................11

Civil Code section 1950.5(e) ...........................................................13

Civil Code section 1950.5(f) ........................................................1, 10


California Rules of Court, rule 8.1115 .............................................21

**CASE LAW**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255,

     106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ...................................6

*Boggio v. USAA Fed. Sav. Bank*,

     696 F.3d 611 (6th Cir. 2012) ....................................................14

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323,

    106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ........................................6

*Cushman v. Trans Union Corp.,* 115 F.3d 220, 225 (3d Cir. 1997) ...................13

*Dennis v. BEH-1,* 520 F.3d 1066, 1069 (9th Cir. 2008)...........................................24

*Drew v. HUNTER Information Services, LLC*, 690 F.3d 1100

    (9th Cir. 2012)........................................................................24

*Edwards v. Toys 'R' Us*, 527 F. Supp. 2d 1197, 1210

    (C.D. Cal. 2007) ....................................................................25

*Fregoso v. Wells Fargo Dealer Services, Inc*., 2012 WL 4903291

    at *6 (C.D. Cal. Oct. 16, 2012) ....................................................24

*Gonzales v. Arrow Fin. Services*, L.L.C.,

    660 F.3d 1055, 1062 (9th Cir. 2011) ...........................................7

*Gorman v. Wolpoff & Abramson, LLP*,

    584. F3d 1147 (9th Cir. 2009) ..............................................13, 16, 17-18

*Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329

    (9th Cir. 1995) .......................................................................11

*Harris v. Bank of Am. Corp*.,

    2014 WL 1116356 (C.D. Cal. Mar. 17, 2014) ...............................14

*Hinkle v. Midland Credit Mgmt., Inc*.,

    827 F.3d 1295 (11th Cir. 2016) ...................................................13

*Johnson v. MBNA Am. Bank*,

    357 F.3d 426, 430 (4th Cir. 2003) ............................................13

*Jones v. Credit Bureau of Garden City, Inc.*,

    703 F. Supp. 897, 901 (D. Kan. 1988) .......................................23

*Kates v. Crocker National Bank*, 776 F.2d 1396, 1397

    (9th Cir. 1985) .......................................................................12

*Lee v. Professional Recovery Systems*, No. A142730,

    2018 WL 1008432, (Cal. Ct. App. Feb. 22, 2018) .....................21

*McCollough v. Johnoson, Rodenburg, & Lauinger,*

    *LLC*, 637 F.3d 939 (9th Cir. 2011) ...............................................24

*Pirouzian v. SLM Corp.,*

    396 F. Supp. 2d 1124, 1130 (S.D. Cal. 2005) ...............................21

*Reichert v. National Credit Systems,*

    531 F.3d 1002 (9th Cir. 2008) .......................................................22

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56-58, 71,

    127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007) ...............................25

*Schneider v. TRW, Inc*. (9th Cir. 1991) 938 F.2d 986...............................6

*Southern Calif. Gas Co. v. City of Santa Ana*

    (9th Cir. 2003) 336 F3d 885, 888..................................................6

*St. Paul Guardian Insurance Co. v. Johnson*, 884 F.2d 881, 883

    (5th Cir. 1989) ...............................................................................12

*Valentine v. First Advantage*, 2009 U.S. Dist. LEXIS 110153, 10

    (C.D. Cal. 2009) ...........................................................................24

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. BACKGROUND FACTS.

Plaintiff and his brother lived in an apartment in San Diego for approximately eleven months.  (Def. UF #1.)   When Plaintiff gave notice of his intent to vacate, on November 5, 2014, he simultaneously provided the apartment manager with a written request for an initial inspection of the premises pursuant to Civil Code section 1950.5(f). (Pl. Dec. ¶¶3, 4.)  [1]

However, the inspection was never conducted, and no one with the management company ever responded to Plaintiff's request for an inspection.   (Pl. Dec. ¶¶5, 6.)  Nor was Plaintiff ever provided with an itemized list of items which were required to be repaired or cleaned, though such a pre-move-out itemized list is required by Civil Code section 1950.5(f)(2) when the parties cannot agree on an inspection date. (Id.)   In short, under California law, Plaintiff and his brother owed nothing to their landlord for repairs and/or cleaning.

Nevertheless, after they moved, the landlord (hereinafter, "the Heritage") sent Plaintiff an invoice which indicated that not only was his entire security deposit devoured, the Heritage now claimed he owed $1,630.66 more.   Although Plaintiff and his brother had lived in the unit for less than a year, the Heritage had decided to purchase a brand new carpet, and had charged Plaintiff prorated rent and parking until December 6, 2014.[2]

Plaintiff immediately contacted the Heritage to dispute the illegal demand.

---

[1]    California law provides that if an initial inspection is requested by a tenant, her landlord cannot deduct any money from her security deposit – or demand money for cleaning or repairs – without first complying with her request for inspection and giving her an opportunity to make any necessary repairs, or conduct any necessary cleaning.   Cal. Civ. Code. §1950.5(f).

[2]    The moving papers include no evidence that the Heritage actually bought new carpeting after Plaintiff vacated.

The Heritage directed Plaintiff to its parent company's in-house attorney from Ohio, Kristen Cavin, who stated, in an email dated March 17, 2015, "My client's position is that when you were asked to set an appointment date and time for a pre-move out inspection [sic], you declined." This "position" was not attributed to any particular individual at the Heritage, and HW has not provided any declaration or document which supports the contention; nor did HW identify in its discovery responses (or initial disclosures) any actual human being willing to vouch for the truthfulness of the assertion. (Exhibit "2," Butler Dec.; pp. 21:1-22:4; Interrogatory No. 17: "If YOU contend that HOVHANNES MARKOSYAN presently owes any money to The Heritage, please . . . d) IDENTIFY all PERSONS with personal knowledge of facts supporting YOUR contention . . ." HW responded, in its supplemental responses, "this request [sic] is vague and ambiguous as to time and scope of 'personal knowledge.'")

Plaintiff replied to the lawyer's letter the same day, in part:

"as stated over the phone yesterday an inspection was not decline[d] verbally or in a written manner . . . . The leasing office was fully aware of the request for an inspection and no cancellation was ever given. In addition had an inspection been done, I would have had an opportunity to clean/fix the carpet in a more time efficient as well as cost effective manner. After all the leasing office was well aware that I had a personal business that manufactured cleaning supplies ranging from window cleaners to carpet cleaners."

Plaintiff heard nothing more from the Ohio lawyer – or his former landlord – for than a year and a half after that. (Plaintiff Dec., ¶11.)

Then along came defendant HUNTER WARFIELD ("HW"). HW first wrote to Plaintiff on September 9, 2016, stating in part, "your delinquency in the amount of $1,630.66 which is owed to our client, THE HERITAGE, is outstanding . . ."

(HW's initial letter is attached to the Machado Dec. As Exhibit "G.")

Plaintiff responded October 5, 2016, demanding validation of the debt. (Exhibit "H," Machado Dec.)

HW responded on October 13, 2016, indicating with surprising prescience that it needed "additional time" to respond to the request, and promising that, in accordance with the FDCPA, "we have suspended collection activity and credit reporting on the above-referenced account until we can properly validate the debt." (Exhibit "I," Machado Dec.)

By this time, Plaintiff was working as a courtroom clerk in the Clara Shortridge Foltz criminal courthouse of the Los Angeles Superior Court, located on Temple Street in Los Angeles. Since Plaintiff believed his employer occasionally reviewed its employees' credit reports, such as in promotion reviews, HW's promise – that his credit would not be illegitimately blemished – was quite important.

Unfortunately, HW was lying. HW soon instructed all three major consumer reporting agencies – Experian, Trans Union, and Equifax – to report that Plaintiff had failed to pay his landlord a debt of more than $1,600.00.

According to the moving party's Machado Declaration, HW vainly requested documentation from the Heritage on October 13, 20, 27, and November 17, 2016 – *four times* before HW reported the derogatory information. (Machado Dec., ¶13.) What the declarant omits, of singular importance, is that the October 27, 2016, entry in the collection logs (Doc. 25-8, page 8 of 19) states the following ominous text, inscribed by HW itself:

" * * * * FINAL ATTEMPT * * * *"

"If we do not receive these documents we may have to review this account for cancellation due to incomplete information available and time constraints placed on debtor disputes. If the documents are not available please advise and we will handle accordingly. [¶] Thank you in advance for your help, it is highly appreciated." (Exhibit "F", Machado Dec., page 9 of 19.)

The next entry from the HUNTER WARFIELD's logs (Exhibit "F," Macachado Dec., page 8 of 19) – 11/03/16 – reads, in part:

"Need Documents/Document Request: *Unfulfilled - Client Unresponsive*"

Despite the indifference of its own client to a threat that the account would be dropped, HW went ahead and blemished Plaintiff's credit.

After the 10/27/16 "FINAL ATTEMPT" communication with the Heritage, HW asked for documents again on 11/17/16.   Rather than further intensifying its language, it reverted to the same mild language it utilized in the initial request for documents on 10/13/16.   And, HW actually narrowed its request to just three documents, rather than the larger list it had requested on three prior occasions.   Even this did not work; HW had to make two more attempts before its client finally provided documents.   (Exhibit "F" to Machado Dec.)

On January 10, 2017, Plaintiff again wrote to HUNTER WARFIELD, observing, "As of today, you have failed to respond to my requests," and concluding, "Since you have failed to reasonably establish that I owe the debt . . . I assume that you have been unable to validate the debt and therefore, I consider this matter closed."   (Plaintiff Dec., Exhibit "1.")   Plaintiff added, "I must remind you that any attempt to collect this debt without validating it, violates the FDCPA . . ."

HW did not respond to that letter at all, and despite the challenging language of the letter, it apparently did not trigger a review of the account.   A review of the account might have enabled HW to realize that it had already, as it now concedes, "erroneously" reported the false derogatory information to all three CRAs.

More than a month later, however, Plaintiff was alerted by a credit monitoring company called KreditKarma that his FICO score had dropped, and that the landlord's debt had been reported to consumer reporting agencies – despite HW's promise of October 13, 2017.   (Plaintiff's Dec., ¶15.)

Plaintiff disputed the reporting with all three major consumer reporting agencies, including twice with Equifax.  The last three disputes were based on letters describing background facts which explained why the debt was invalid.  (Plaintiff's Dec., ¶¶16-17.)   The letters accompanied the last three ACDV's received by HW. (Exhibit "J," Machado Dec.)

HW's reinvestigation in response to the ACDVs took only about two weeks each.  Every time, HW responded to the ACDV's either on the actual due-date for the response, or one day before.   (Exhibit "J," Machado Dec.)  Although HW insisted upon receiving the Heritage's documents in order to respond to Plaintiff's request for validation under the FDCPA, HW verified the debt in response to all four ACDV's without having received *any documentation at all* from its client.

HW's 30(b)(6) witness conceded that it was *not* consistent with HW's policies and procedures for HW to report the debt to the reporting agencies.  (Machado Deposition Transcript (hereinafter "DT"), Exhibit "1" to Plaintiff's Counsel's Declaration, 19:11-23.)   She also conceded that the ACDVs were mishandled inasmuch as HW's personnel failed to realize that the reporting never should have taken place at all.  In regard to the Trans Union ACDV, the witnesses conceded there were multiple "failures."  (Machado DT, 146:13-147:2)

It was not until June 20, 2017, that HW finally provided Plaintiff with "validation" of the debt.   (See Exhibit "K" to the Machado Declaration.)   The Heritage's documents had finally been received the day before.    Yet after receiving the documents – which were consistent with Plaintiff's version of events, and reflected that Heritage had mysteriously changed its own ledger entries to justify demanding a larger alleged debt (Plaintiff Dec., ¶¶18-19)  – HW never asked the Heritage for an explanation.   Instead of sending Plaintiff all of the documents – including his request for an inspection and notice of intent to vacate – HW selected only two: the lease, and the ledger.  (Exhibit "F" to Machado Dec., 6/20/17 entry on page 4 of 19, four rows down: "WILL SEND LEASE AND LEDGER.")

OPPOSITION TO M.S.J.

Even after receiving the documents – which far from providing validation of the debt, only cast further doubt upon the Heritage's story – HW continued to report the debt until afer this lawsuit was served.

## II. THE APPLICABLE STANDARD.

In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is proper only if the moving party shows that there is no genuine dispute as to any material fact and that such moving party is entitled to judgment as a matter of law. (Fed. R. Civ. Pro. 56.)

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Where the moving party has the burden, its showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. See *Southern Calif. Gas Co. v. City of Santa Ana* (9th Cir. 2003) 336 F3d 885, 888. Moreover, the moving party's evidence is judged by the same standard of proof applicable at trial. (Id.) Without specific admissible facts supporting the moving party's conclusion, a bald assertion of an ultimate fact is insufficient. *Schneider v. TRW, Inc.* (9th Cir. 1991) 938 F.2d 986.

Most of HW's purportedly Undisputed Facts are, in fact, disputed. Even if they were in fact undisputed, the legal conclusions drawn from them are non-sequitur, and fail to show HW's compliance with the law, or to establish affirmative defenses.

Moreover, a great many of the moving party's "undisputed facts" are not supported by any admissible evidence at all,[3] but rather are directly negated by the

---

[3]     For instance, HW's argument that the debt they attempted to collect was a valid, enforceable debt, hinges on factual contentions that are

only competent evidence presented to the Court – some of which is in the moving papers.   For instance, HW's "Undisputed Fact" #3 asserts, "Plaintiff verbally declined the inspection with the Heritage," but the evidence in "support" is not admissible at all; the referenced paragraph 26 of the Machado declaration says absolutely nothing about Plaintiff waiving an inspection, and simply refers to a letter from an Ohio lawyer working for the Heritage's parent company, in which the lawyer articulated her client's "position" months after the move-out.   The only competent evidence the moving party submits on the issue is found in the excerpt from Plaintiff's deposition, 30:1-3 (Dec. Eldridge, Ex. "E"), where the Plaintiff stated that he "never told anyone that I changed my mind and don't want an inspection. I've never, ever in my life said no to an inspection."   In other words, not only is it patently untrue that there is no genuine dispute on the issue; the only admissible evidence HW presents supports the opposite position.

## III. ARGUMENT.

### A. HW VIOLATED THE FDCPA AND THE ROSENTHAL ACT.

Although "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional" are relevant considerations in determining damges amounts (15 U.S.C. §1692k(b)(1)), "The FDCPA does not ordinarily require proof of intentional violation, and is a strict liability statute." *Gonzales v. Arrow Fin. Services*, L.L.C., 660 F.3d 1055, 1062 (9th Cir. 2011).

HW has violated the FDCPA and the corresponding California Rosenthal Act in the following two principal ways:

1) By continuing to take collection actions – namely, reporting the alleged

---

not supported by any declarant from the Heritage.  Documents which purportedly support HW's version of the facts – such as photographs – are not authenticated.  See Plaintiff's Evidentiary Objections.

debt to three reporting agencies – despite having received Plaintiff's October 5, 2016, dispute and request for validation, in violation of 15 U.S.C. §1692g(b); and relatedly, by reporting the alleged debt to the reporting agencies in violation of 15 U.S.C. §1692e(8), which prohibits "Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed"; and

2) By seeking to collect $1,630.66 (and, subsequently, interest on that amount) which was not owed, in violation of 15 U.S.C. §1692f, which states, " A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

HW's conduct in both of those related acts also violated section 15 U.S.C. §1692e, which states, "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: [ . . . ] (10) The use of any false representation or deceptive means to collect or attempt to collect any debt . . ."

HW's initial September 9, 2016, letter was false, deceptive and misleading in stating that Plaintiff owed the $1,630.66 in the first place – and, the derogatory reporting HW made to the CRAs was equally false and misleading. Additionally, HW's October 13, 2016, response to Plaintiff's dispute and request for validation – attached to the Machado Dec. as Exhibit "I" was also false, deceptive and misleading in that it asserted, "we have suspended collection activity and credit reporting . . . until we can properly validate the debt."   Credit reporting was not suspended.

The foregoing FDCPA sections are incorporated into the California Rosenthal

Act by Civil Code section 1788.17, providing in pertinent part, "Notwithstanding any other provision of this title, every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code . . . ."

HW concedes that it reported the derogatory credit information to the agencies after receiving Plaintiff's October 5, 2016, letter requesting validation of the debt but before providing the validation response on June 20, 2017 (see Machado Dec., ¶¶20-21).   That is a violation of the FDCPA[4].   And since HW communicated the false derogatory information to three separate CRAs – Experian, Trans Union, and Equifax – HW's actions violated the FDCPA three times.

HW then violated the same section four more times – by again communicating with the three CRAs in response to the ACDVs.  (See Motion, 2: 4-24.)  Those communications verified the derogatory information as accurate.   While HW applauds itself that "Defendant responded timely to each ACDV, verifying the account as accurate" (Motion, 2:25-26, citing SOF, No. 29) – HW seems to overlook that each and every time it responded to the ACDVs by verifying the debt, it again violated the FDCPA by verifying the information to the CRAs (15 U.S.C. §§ 1692g(b) and 1692e(10).   All total, HW communicated false derogatory credit information about Plaintiff to CRAs before validating the debt, but after receiving the validation request, *seven times.*

While HW takes pains to minimize the violation – stating, for example, "Unfortunately, during the October 16, 2016 suppression of collection activity, a credit report flag was importantly omitted during the process" "(Motion, 2:24-26, referencing SOF, No. 24.) – HW never explains how it is that its employees continually failed to notice the fact that the reporting had not been suppressed each

---

[4]  15 U.S.C. §§1692g(b) and 1692e(10).

of the *four times* the employees responded to the ACDVs by verifying the debt to the reporting agencies.  Nor does HW explain why it failed to respond at all to Plaintiff's letter from January 10, 2017, in which Plaintiff reminded them that they failed to respond to his previous letter and their obligations to cease collection.  (Exhibit "1," Plaintiff's Declaration."

The mere fact that HW reported the derogatory information in error in the first place, but then failed to notice its own mistake over and over, utterly refutes HW's claim of bona fide error.  HW's bona fide error defense is also undermined by the fact that – as conceded in its discovery responses – HW has been sued more than seventy five times for FDCPA violations comparable to the ones alleged in this case. (Butler Dec., Exhibit "2.")

While HW claims that Plaintiff has made "naked allegations" that he did not owe the debt, the fact is, his assertion is the only version of events that is supported by competent evidence; HW fails to present any first-hand testimony from anyone at the Heritage who claims a version of events different from Plaintiff's.   Moreover, HW's purported evidence – such as the photographs – is not properly authenticated.[5]

Moreover, even if the photographs were accurate and showed damage, under California law, if the tenant requests an inspection but one is not provided, the landlord cannot withhold rent or pass on the cost of repair to the tenant.  If the landlord and tenant cannot agree on an inspection date, the landlord has a remedy – to provide legally required notice, then make an inspection and provide an itemized list.  (Code of Civ. Proc. §1950.5(f).)

Even if it were somehow true that Plaintiff had not requested an inspection, or had waived an inspection, HW has still sought to collect the wrong amount, and that

---

[5]   Ms. Machado includes the photographs in Exhibit "C," the letter from Heritage's Ohio counsel.  However, the photographs were actually not attached to that letter when it was received by Plaintiff, as stated in Plaintiff's declaration.  ¶9.

fact is reflected in Heritage's own ledger, which shows the original entries – reflecting a date for the end of the tenancy of 12/04/16 – being deleted, then replaced with new entries showing an end date of 12/06/16, which change – departing from the actual facts – purportedly entitled HW to another $118.32.  The moving party did not submit this ledger to the Court until pressed by Plaintiff's counsel to do so. (Butler Dec., ¶5.)

If HW had actually read the ledger, HW would have seen that the Heritage's underlying documents were inconsistent.  Had HW been concerned about collecting the right about of money – i.e., fulfilling its obligations under the FDCPA, the FCRA, etc. – HW should have immediately inquired further, demanding additional information, from the Heritage to sort out the discrepancy.  But HW did not do that.

Finally, as Plaintiff also pointed out in his dispute letters to the CRAs, California law prevents landlords from deducting money for ordinary wear and tear. Civil Code Section 1950.5(b)(2),(e). Yet the final account statement shows a deduction for "Full Cleaning of Apt."   While the photographs were not properly authenticated, assuming they showed Plaintiff's apartment at all, they were seemingly taken before the "full cleaning."   It is unclear if after the "full cleaning" replacing the carpet was still necessary.   If the carpets were not cleaned, why was the term "full cleaning" used; and if they were in fact cleaned, why do that at all, if they were only going to be replaced?

Moreover, there is no evidence submitted by the moving party showing that the Heritage actually purchased a new carpet for the apartment Plaintiff had lived in for 11 months.   The carpet invoice included in Exhibit "C" to the Machado Declaration – which is also not authenticated – is dated October 16, 2013 – before Plaintiff acquired possession of the premises.

## B. HW VIOLATED THE FCRA AND THE CCRAA.

As pointed out by the court in *Guimond v. Trans Union Credit Info. Co.*, 45

F.3d 1329, (9th Cir. 1995),  "[t]he FCRA was the product of congressional concern over abuses in the credit reporting industry."  (Citing *St. Paul Guardian Insurance Co. v. Johnson*, 884 F.2d 881, 883 (5th Cir. 1989).)  "The legislative history of the FCRA reveals that it was crafted to protect consumers from the transmission of inaccurate information about them [citing inter alia, *Kates v. Crocker National Bank*, 776 F.2d 1396, 1397 (9th Cir. 1985)]; and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner.  [Citations omitted.]"  Moreover, "[t]hese consumer oriented objectives support a liberal construction of the FCRA."  (Citing *Kates,* 776 F.2d at 1397.)

"The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases."  *Guimond v. Trans Union Credit Info. Co. Supra*, 45 F.3d at 1333.

Once a furnisher receives a notice from a CRA that a consumer has disputed information which it has provided, that furnisher must review the information provided by the CRA and conduct its own investigation of the accuracy and completeness of the disputed information.   15 U.S.C. §1681s-2(b).

While HW's UF's 25-28 focus on the codes that the CRA's used in the ACDV forms, 1681s-2(b)(1)(B) explicitly states that the furnisher shall "review all relevant information provided by the consumer reporting agency."   In this case, scanned images of Plaintiff's dispute letters to the CRA's were attached to his second, third, and fourth disputes – though not to the first dispute directed to Equifax.  Those letters – included in Exhibit "J" to the Machado Declaration – all stated that the Heritage "failed to conduct an initial inspection of the premises with me before I moved out, despite my repeated requests orally and in writing that such an inspection be provided," and "failed to furnish me with an itemized statement of damages or repairs prior to termination of the tenancy, in order to allow me an opportunity to rectify the perceived issues," then went on to correctly summarize California law – that " a landlord may not deduct money from a security deposit in the absence of the

landlord's compliance such basic tenant rights laws" (citing Civ. Code §§ 1950.5(f)(4),(5), 1950.5(e)), and finally added, "the landlord has included in the amount it claims is owed fees imposed to cover ordinary wear and tear, in violation of California law."  (Plaintiff's Dec., ¶16; Exhibit "J" to Machado Dec.)

Courts have consistently adopted the "reasonable investigation" standard that requires furnishers to conduct a substantive inquiry to determine whether the disputed information can be verified.   *Gorman v. Wolpoff & Abramson, LLP*, 584. F3d 1147 (9th Cir. 2009).  It is the same standard applicable to CRAs under section 1681i.

The Fourth Circuit emphasized that the investigation must be a substantive examination of the merits of the consumer's dispute, and that a reasonable investigation "requires some degree of careful inquiry" as opposed to a merely "superficial" inquiry.  *Johnson v. MBNA Am. Bank*, 357 F.3d 426, 430 (4th Cir. 2003).  Comparable to how the CRA's "reasonable investigation" may not simply "parrot" the furnisher's position (*Cushman v. Trans Union Corp*., 115 F.3d 220 (3d Cir. 1997), the furnisher's "reasonable investigation" must contain a "qualitative component" and may not merely beg the question by confirming simply that the disputed information itself is being faithfully conveyed to the CRA.

Similarly, the Eleventh Circuit pointed out in *Hinkle v. Midland Credit Mgmt., Inc*., 827 F.3d 1295 (11th Cir. 2016),  "when a furnisher does not already possess evidence establishing that an item of disputed information is true, § 1681s-2(b) requires the furnisher to seek out and obtain such evidence before reporting the information as 'verified' . . . The requirement to uncover additional facts will be more or less intensive depending on what evidence the furnisher already possesses."

The deposition testimony of HW's Compliance Officer shows that HW, at best, utilizes a "data conformity" type review.   (Machado DT, Exhibit "1" to Butler Dec., 123:14 - 124:19.)  Courts all over the country have held that this hollow "data conformity" examination violates the furnisher's duty to conduct a reasonable

investigation.   In addition to *Johnson* and *Hinkle*, *supra*, see *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611 (6th Cir. 2012) (reinstating consumer's claim for punitive damages when evidence showed that furnisher's data conformity "policy prohibited its employees from performing anything more than a cursory confirmation" of its own records"); *Harris v. Bank of Am. Corp*., 2014 WL 1116356 (C.D. Cal. Mar. 17, 2014) (denying dismissal; consumer adequately alleged that investigation was unreasonable where the furnisher's regular practice "never considers the basis of the dispute" and instead "verif[ies] that the derogatory information which is the subject of the dispute is the same as the information contained in their systems")

In her deposition, HW's Compliance Officer, Ms. Machado, stated that HW's policy "means when we receive the creditor's information, that we validate it against what we've entered into our system as being accurate to what the creditor is stating."

Q: "So the way you validate information from a creditor is by comparing it to the information from the creditor?"

A: "We ask them to review their records and provide the information back to us."

Q: "Okay.  And that, then, fulfills, by your interpretation, the obligations of ensuring that the information is accurate and true?"

MR. KAMINSKI: "Objection to the extent that [sic] it's calling for expert opinion, legal conclusion, vague and ambiguous."

THE WITNESS: "Yes.  We're validating against what the creditor provides." (Machado DT, 123:14 - 124:19; Exhibit "1" to Butler Dec.)

It should be emphasized that when Ms. Machado stated, "We ask them to review their records and provide the information back to us," even assuming what she meant was, "We ask them to review their records *and make sure those records are accurate*" – which is not what she testified – there is no indication from the

collection logs that any such asking ever occurred.   In not one instance – as reflected in the collection logs – did HW ask anything at all of the Heritage relating to the points Plaintiff made in his letters attached to the last three ACDVs.

Similarly, Ms. Machado testified, "Certainly, it's the intent that we're asking them to look closely at their records to see if they identify any errors."   (Machado DT 116:11-13.)  But that laudable "intent" was not actually communicated from HW to its client anywhere.  All HW asked is that the Heritage provide documents – and five times, it refused.   Nothing else was asked for.  HW's investigation included nothing more than reviewing the basic information provided when the account was assigned, such as the name, basic date of birth, amount allegedly due, social security number.  (Machado DT, 145:14-22; 86:11-87:7.)

Putting all of that aside, HW admits that it mistakenly furnished the information the CRA's in the first place.   HW verified the derogatory information to all three CRA's a total of four times without having obtained any underlying documents from its client, without telephoning its client to address the issue, without making special requests for documents based upon the ACDVs, and while consistently failing, in the process, to notice that it had to suppress credit reporting. HW's own compliance officer admitted that HW had committed multiple "failures" in the handling of the disputes.   (Machado DT, 146:13-147:2.)

When asked at her deposition whether investigators would be expected to actually review the log notes for the files they were supposed to be investigating, thus perhaps noticing that they were reporting an account they had earlier recognized they should not report, Ms. Machado conceded, "we would hope they would do some review" (Machado DT, 139:24-25; Exhibit "1" to Butler Dec.).  Yet she also noted that "[t]here are times that the account notes can be very excessive."  (Id., 139:22-23.)  It is surprising to hear a Compliance Director employ the term "hope" when describing employees' compliance with legal obligations, and then apparently excuse their failure to even read the log notes on the grounds that the logs can be "very

excessive," and thus apparently, less than riveting.   A compliance director might be aware that the U.S. Congress did not express a similar "hope" that furnishers behave well; the relevant words from 1681s-2(b) are "Duties of furnishers," and "shall.")

The Fair Credit Reporting Act prohibits the furnishing of information which the company "knows or has reasonable cause to believe is inaccurate."   15 U.S.C. §1681s-2(a)(1)(A).   While that provision is not privately enforceable, California's CCRAA similarly bars entities from furnishing information if it "knows or should know the information is incomplete or inaccurate."  (Civ. Code §1785.25(a).)  That provision of the CCRAA is privately enforceable.   *Gorman v. Wolpoff & Abramson, LLP*, 584. F3d 1147 (9th Cir. 2009).

Even after HW threatened to drop the account, Heritage ignored HW's requests for supporting documents.  Heritage's obstinate refusal to provide supporting documents  – so repeatedly that HW described them as "unresponsive" – in and of itself should have given HW cause to know that the debt was invalid.

It is no coincidence that the Heritage resisted so strenuously, and for so long.  When the documents were finally provided, they supported Plaintiff's assertions – he plainly asked for an inspection, and none was provided.   The only documents that could possibly constitute itemized lists were dated after his move-out.   Moreover, the Heritage's own ledger was mysteriously adjusted to increase the amount owed, though the original entries pro-rated rent and parking were entirely consistent with Plaintiff's testimony; the revised entries were not.

Yet even after receiving these documents, HW continued to report the derogatory and inaccurate information, until – according to the moving party - October 22, 2018.   (HW's UF #22.)[6]

While Ms. Machado tried out the argument that the investigator might have noticed the notation that the account was credit suppressed, and "ascertained this to

---

[6]        Evidently a typo; apparently what was meant was October 22, 2017.

be correct" (Machado DT, 140:1-4) – that is, erroneously assumed the suppression actually did occur – the argument makes no sense at all.   If an investigator is provided with an ACDV from a CRA and asked to respond to the consumer's dispute, clearly the credit reporting had not been suppressed, otherwise there would be no dispute.  No CRA could coherently ask a furnisher to verify data that was *not* appearing on the CRA's consumer report.

HWI's Compliance Director devotes one sentence to describing the threadbare investigation process, at para. 24: "HWI reviewed its information provided by the Heritage and timely responded to each dispute."   What is left out is that HW neither sought nor obtained any *new* information from the Heritage in responding to the ACDVs, and the phrase "its information" refers to the very same information HW used to report the blemish in the first place.

Moreover, in responding to the June 1, 2017 Experian ACDV, and the May 25, 2017, Equifax ACDVs, HW's employee responded with code 24, "Consumer's dispute not specific," even though Plaintiff's letters were attached to those ACDVs, expressing clearly that a pre-move-out inspection had been request but not granted, that no pre-move-out itemized list had been provided, etc.  All of the ACDV responses include the following certification: "By submitting this ACDV, you certify that you have reviewed and considered all associated Images" – meaning, the letters attached to the last three ACDVs – "you have verified the accuracy of the data in compliance with all legal requirements, and your computer and/or manual records will be adjusted to reflect any changes noted."   (Ex. "J" to Machado Dec., at the end of all four ACDVs.)  Thus the manner in which the CRAs may coded the dispute cannot be used by HW to duck responsibility to conduct a reasonable investigation.

The Motion argues at page 5:13-17 that "[w]hen 'scant' information is provided in a notice of dispute, this limits the furnisher's investigation. As recognized by the Ninth Circuit, 'The pertinent question is thus whether the furnisher's procedures were reasonable in light of what it learned about the nature of

the dispute from the description in the CRA's notice of dispute.'" (Citing *Gorman,* 584 F.3d. at 1157.)  The notion that the ACDV's provided only "scant" information is absurd; Plaintiff's dispute letter explained in detail how the Heritage failed to provide a requested inspection – or pre-move-out itemized list – and specified controlling California law on the point.  Moreover, The documents that HW eventually received included Plaintiff's request for inspection, and only itemized lists date after his move-out date.   All of the actual underlying documents HW eventually received were consistent with Plaintiff's version of events.

There is no way that merely confirming the Plaintiff's name, social security number, date of birth, alleged delinquency date, etc., constitutes a reasonable investigation of the points made in Plaintiff's dispute letters.  This is the quintessential "data conformity" review which has been universally rejected.

The moving party concedes, even while attempting to defend its purported investigation, that "Only on June 19, 2017 did HW finally receive additional documentation from Heritage in response to its requests" (Motion, 7:24-26, citing its SOF 30).   In essence, HWI defends its ignorance by blaming its client – yet its client had demonstrated itself to be "unresponsive" – using HWI's adjective – for eight months, ignoring repeated requests.

HWI had an alternative: It could have deleted the credit reporting until the documents were actually provided, and then re-furnished the negative information.

Moreover, repeatedly throughout her deposition, HWI's declarant emphasizes that HWI relies on its clients to provide accurate information.   (Machado DT, 97:15-16, "Again, we rely on the creditor to provide the correct information; 133:14-17, "We rely heavily on the documents the creditor provides.")   HWI does not explain how it can in good conscience "rely on" a client that has ignored its own request for documents for eight continuous months.  The astounding fallacy in this policy of blind reliance overlooks the basic legal reality that it is HWI that is bound by the FDCPA and the FCRA.   The Heritage, as a creditor, can be unconcerned with the

FDCPA, since the FDCPA does  not apply to creditors; similarly, since the Heritage itself was reporting nothing to any consumer reporting agency, could not possibly violate the FCRA.   It is obviously reckless – if not outright suicidal – for a debtor collector engaged in credit reporting – and thus obligated to comply with the FDCPA and the FCRA – to blindly "rely on" entities that share no such potential liability in making decisions directly impacting its own legal compliance.  (Machado DT, 97:15-16; 133:14.)   In this case, the reliance was particularly misplaced since the Heritage was so "unresponsive," and in fact did not provide any "documents," aside from the Plaintiff's identifying information and a conclusory debt total and delinquency date.

Not only did HW admit to reviewing no underlying documents at all in purportedly investigating the assertions in Plaintiff's letters – which accompanied the last three ACDVs – it did not even reach out to the Heritage in the investigation process with a request to specifically address any of Plaintiff's assertions.   In her deposition, Ms. Machado admitted that this was not how the dispute should have been handled; that it was "one of her failures," and that "there should have been additional clarification from the client."  (Machado DT, 146:13-147:2.)   While she was specifically referring to the Trans Union ACDV, the letters to all three reporting agencies were, in terms of content, the same.

The patent inadequacy of HW's investigation is highlighted by the contrast between how HW handled the October, 2016 request for validation under the FDCPA with how it handled the later disputes directed to the consumer reporting agencies ("CRAS").   While HW does not actually state that any of its employees ever actually read the documents it received from the Heritage on June 19, 2017 – indeed, reading the documents would have raised serious concerns about the validity of the debt – it did indeed feel it was necessary to at least actually obtain something from its client.   So it waited for eight months.

In arguing against the impermissible use claim, HW offers no competent

testimony or actual exhibits.  SOF 44 states not so much a fact, but an argument: "Defendant does not have record of pulling Plaintiff's credit report, but if it did pull the report, it would have been pursuant to its collection efforts."   The Machado declaration states exactly the same thing.   Obtaining the credit report for collection purposes is only permissible if the collector has the right to collect, and in this case, Plaintiff owed the Heritage nothing.   Moreover, Ms. Machado does not claim to be a custodian of records, so how she knows that HW "does not have a record of pulling Plaintiff's credit report" is unclear.  Further, as testified by Plaintiff, he mailed HW a letter on January 10, 2017, reminding HW of their obligations relating to debt validation, yet HW's account logs show no entries *at all* from between 12/02/16 and 2/7/17 – a period  which includes the 12/06/16 date that Ms. Machado testifies HW initiated credit reporting.   Clearly HW having no record of something is not a strong indication that it did not happen, or that a document did not exist, at some point. (Exhibit "F" t the Machado Dec., ECF Doc No. 25-8, PAGE ID#: 257; Bates No. HWI000046.)

HW contends that it began furnishing derogatory information about Plaintiff in December, 2016 (Machado Dec., ¶¶20 - 21), and while conceding this was an "error," asserts that it reported the debt as "disputed."   There is no evidentiary support for that contention; Ms. Machado was  not involved in any way in the handling of Plaintiff's account, and the moving papers contain no documentary support for the assertion that the debt was reported as disputed from the start.

### C. PLAINTIFF'S CLAIMS UNDER THE CCRAA AND THE ROSENTHAL ACT ARE NOT PREEMPTED.

Starting with the apparently sweeping and plainly false assertion that "Plaintiff's CCRAA and Rosenthal Act claims are preempted" (Motion, 17:1), HW then qualifies its argument at lines 21-22: The preemption of CCRAA claims is only "to extent Plaintiff seeks to allege CCRAA claims beyond those in Section

1785.25(a)."

Even the dwindling form of the argument is misleading.   For instance, the reference to *Pirouzian v. SLM Corp.*, 396 F. Supp. 2d 1124, 1130 (S.D. Cal. 2005) is patently inapplicable for reasons readily apparent from HW's own narrow excerpt: "All of the CFDCPA claims in this case are preempted by the FCRA because they pertain to Defendant's reporting of or failure to report certain information about Plaintiff," *Pirouzian* held.   But in this case, Plaintiff's Rosenthal Act claims are based in part on attempts to collect a debt simply not owed, representations that the debt existed, and attempts to collect the debt prior to fulfilling a validation request. Based upon the very language that HW quoted, *Pirouzian* is distinguishable.

HW's reference to *Lee v. Professional Recovery Systems*, No. A142730, 2018 WL 1008432, (Cal. Ct. App. Feb. 22, 2018) – an unpublished California court of appeals case – is unorthodox, since that court explains, "Unpublished or 'non-citable' opinions are opinions that are not certified for publication in Official Reports and generally may not be cited or relied on by other courts or parties in other actions (see California Rules of Court, rule 8.1115)."

## D. THE BONA FIDE ERROR DEFENSE DOES NOT SHIELD DEFENDANT FROM LIABILITY.

HW's bona fide error defense hinges partly on the lack of intent.   However, the moving party's declarant cannot testify about the intent of the HW employees handling the account, though she purports to do so (Dec. Machado, ¶22), since she was not one of those employees.   Ms. Machado conceded at deposition that she had not so much as even heard of Plaintiff prior to 2018, well after the lawsuit was filed and the account was no longer active.   (Machado DT, 14:3-6.)

It is not credible to suggest that HW had appropriate policies and procedures in place – warranting a bona fide error defense – since HW made the same type of mistake three times as to the initial reporting (i.e., HW reported the same alleged

debt to all three bureaus), then verified the erroneous reporting in response to each and every one of the four ACDV's it received.

Moreover, even if the bona fide error defense shielded HW as to the violations of the FDCPA stemming from credit reporting violations, the moving party has not presented evidence of a policy at HW guarding against dunning consumers for the wrong amount.  HW should have become seriously doubtful about its own client's contentions when the client – which HW itself described as "unresponsive" in its own notes – failed for month after month, demand after demand, to provide supporting documents.   Finally, the invalidity of the claim should have been readily apparent from the Heritage's own documents – including both the inconsistencies in the ledger, and the request for inspection, which corroborated Plaintiff's letters attached to the ACDVs.   "A debt collector is not entitled under the FDCPA to sit back and wait until a creditor makes a mistake and then institute procedures to prevent a recurrence." *Reichert v. National Credit Systems*, 531 F.3d 1002 (9th Cir. 2008).  To qualify for the bona fide error defense under the FDCPA, the debt collector has an affirmative obligation to maintain procedures designed to avoid discoverable errors, including errors in calculation and itemization.  Id.

When it came to handling the persistently elusive documents – and its "unresponsive" client – HW's procedure, if any, was blind faith followed by wilful ignorance.  At her deposition, Ms. Machado pointed out "the system makes three requests" (Machado DT 80:14-22), and that in order to make more requests, a new case number has to be assigned (Machado, DT 81:1-21).   Thus after the third warning – which HW warned its client was the "final" warning – rather than actually returning the file, or further intensifying the tone of its requests, HW simply a made a fourth request was no different from the first – except that the document request was actually less expansive, and then a fifth request no more urgent than the second. (Exhibit "F" to the Machado Dec., entries for 10/27/16, showing a case number of 296914 – also shown on 10/13/16 and 10/20/16 – and 11/16/16, showing a new case

number of 300185.)

This is not even remotely a procedure for avoiding FDCPA violations, or for filtering out bad debts; it is a system virtually guaranteed to increase the odds of FDCPA violations by what amounts to self-imposed amnesia.   HW's means of dealing with "unresponsive" clients is to simply give them a new case number and pretend that the "final demand" had never happened – as if when a car's odometer flips, the car is suddenly brand new again.

And in fact, when asked about prior FDCPA litigation in discovery, HW ultimately produced a list of more than seventy cases.  (Exhibit "2" to Butler Dec.)

### E. HW DID NOT MAINTAIN REASONABLE PROCEDURES FOR COMPLYING WITH THE FCRA OR CCRAA.

HW argues at page 18 that it should be not liable based upon California Civil Code section 1785.25(g), which provides, "A person who furnishes information to a consumer credit reporting agency is liable for failure to comply with this section, unless the furnisher establishes by a preponderance of the evidence that, at the time of the failure to comply with this section, the furnisher maintained reasonable procedures to comply with those provisions."   HW cites *Jones v. Credit Bureau of Garden City, Inc.*, 703 F. Supp. 897, 901 (D. Kan. 1988), for the point that the FCRA "recognizes the reality of unavoidable mistakes and imposes no liability for inaccuracies when an agency has followed reasonable procedures."

The errors in this case were repeated, egregious, and completely avoidable. HW threatened its client that it would drop the case if the client failed yet again to provide documents – and even though the client ignored that threat, somehow HW did not begin to harbor doubts.   Moreover, had HW's personnel simply reviewed their own account logs during the ACDV review, HW would have become aware of its mistake and taken appropriate steps to delete the reporting.  Further, HW could have read Plaintiff's letters attached to the last three ACDVs, and appropriately

asked the Heritage to clarification of the actual issue of whether an inspection was in fact requested but not provided.  HW did none of those things, and that fact is abundant proof that HW simply did not have a reasonable procedure in place to prevent errors.

## IV. PLAINTIFF HAS SUFFERED COMPENSABLE DAMAGES.

The FCRA allows a consumer to recover "any actual damages sustained by the consumer as a result of the failure . . ."  (15 U.S.C. 1681n(a)(1)(A).)   It is well-established that "emotional distress can give rise to actual damages under the FCRA, whether or not a plaintiff actually is denied credit as a result of the FCRA violation." (*Valentine v. First Advantage*, 2009 U.S. Dist. LEXIS 110153, 10 (C.D. Cal. 2009), citing  *Dennis v. BEH-1, LLC*, 520 F.3d, 1066, 1069 (9th. Cir. 2008).

Emotional distress damages are available under the FDCPA as well.  See, for instance, *McCollough v. Johnoson, Rodenburg, & Lauinger, LLC*, 637 F.3d 939 (9th Cir. 2011), upholding a $250,000.00 actual damages award for emotional distress.

In this case, there is no question that Plaintiff suffered emotional distress damages; see Plaintiff's declaration (¶¶23-26), etc.  The extent of those damages is an issue of fact.

HW appears to question genuineness of Plaintiff's suffering.   Its UF 43 states, "Plaintiff testified he was 'depressed,' and used boilerplate mood adjectives in his discovery responses."  The insinuation is that Plaintiff was not sufficiently original in his choice of adjectives to deserve a legal remedy.

We can't all be Sylvia Plath.  But the ability to express of our own pain in lofty or spell-binding rhetoric is not a prerequisite to Seventh Amendment rights. Summary judgment barring Plaintiff's emotional distress claims would be reversible error.  See, for instance, *Drew v. Equifax Information Services, LLC*, 690 F.3d 1100 (9th Cir. 2012), and *Fregoso v. Wells Fargo Dealer Services, Inc.*, 2012 WL 4903291 at *6 (C.D. Cal. Oct. 16, 2012), denying summary judgment, and noting a low

evidentiary bar in the Ninth Circuit.

## V. A REASONABLE JURY COULD FIND THAT THE DEFENDANT ACTED WILLFULLY.

A willful violation includes both knowing violations and actions in "reckless disregard of a requirement" of the FCRA.    See *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56-58, 71, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007). An action is deemed reckless if it entails "an unjustifiably high risk of harm that is either known or so obvious that it should be known."   (Id. at 68.) As a result, "a company subject to [the] FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."

In any case, "[w]illfulness under the FCRA is generally a question of fact for the jury." *Edwards v. Toys 'R' Us*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007.)

## VI. CONCLUSION.

For all of the foregoing reasons, plaintiff HOVHANNES MARKOSYAN respectfully requests that the Court deny Defendant's Motion for Summary Judgment in its entirety.

DATED: April 20, 2018                    Respectfully submitted,

By:   */S/ Aidan W. Butler*
      Aidan W. Butler
      Attorneys for Plaintiff
      HOVHANNES MARKOSYAN